UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PETERSON HAAK,

          Petitioner,                             Hon. Janet T. Neff

v.                                                  Case No. 1:13-CV-235

WILLIE SMITH,

          Respondent.

_____/


**REPORT AND RECOMMENDATION**

       This matter is before the Court on Haak's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Haak's petition be **denied**.


**BACKGROUND**

       As a result of events which occurred on August 19, 2008, Petitioner was charged with first degree home invasion, aggravated assault, and resisting or obstructing a police officer. (Dkt. #10, 13). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Robert Hillman**

At approximately 9:30 p.m. on the evening of August 18, 2008, Hillman arrived at the Dublin Square bar. (Trial Transcript, July 29, 2010, 35-41). Approximately 15-20 minutes later, Hillman encountered Petitioner. (Tr. 42). Hillman, Petitioner, and a handful of other individuals remained at the bar for approximately two hours during which time the group consumed several rounds of drinks. (Tr. 42-49). While consuming drinks with Petitioner, Hillman did not experience anything "out of the ordinary." (Tr. 63).

After consuming several rounds of drinks at the Dublin Square bar, Hillman and Petitioner walked to Rick's, a bar located across the street. (Tr. 49-50). Hillman and Petitioner both ordered beer. (Tr. 50). The pair exited the bar 20-30 minutes later and began walking up Michigan Avenue. (Tr. 51-52). Hillman estimated that it was close to midnight when they departed Rick's. (Tr. 53). Hillman and Petitioner soon stopped to order sandwiches which they consumed while continuing to walk. (Tr. 53-54).

Shortly thereafter, Petitioner stated that he was "going to the bathroom" at which point he disappeared into "a bunch of bushes." (Tr. 55-59). Hillman waited approximately 20 minutes. (Tr. 59-62). When Petitioner failed to return, Hillman, recalling that Petitioner lived in the vicinity, concluded that Petitioner had simply decided to walk home. (Tr. 55-64). At this point, Hillman decided to return home and departed the area. (Tr. 61-63). On the night in question, Hillman did not experience agitation, sleepwalking, or hallucinations and when he awoke the next morning he "felt fine." (Tr. 62-65).

**Matthew Salmon**

As of August 19, 2008, Salmon was employed as a police officer for the City of Lansing. (Trial Transcript, July 29, 2010, 94-95). At approximately 3:27 a.m., Salmon, who was wearing a police uniform, was dispatched to investigate a "disturbance at a residence." (Tr. 95-96). Salmon was informed that the intruder was still present in the residence, so when he arrived at the location he, and several other officers, established a perimeter around the residence. (Tr. 96). After taking up a position 10-15 feet from the residence, Salmon looked through a window and witnessed Petitioner standing in the living room. (Tr. 97-98, 102). Petitioner was "yelling" and "giving loud verbal commands." (Tr. 97-98).

Salmon heard other officers, who first identified themselves as police officers, instruct Petitioner to "put your hands in the air." (Tr. 98). Petitioner did not comply, but instead "began to yell the same commands back at" the officers. (Tr. 98). Petitioner then began "holding his hands as if he had, like, a long gun or a shotgun." (Tr. 98). It was obvious that Petitioner did not actually possess a weapon, but Petitioner was nevertheless "pretending to pump a shotgun and fire it." (Tr. 98-99). Salmon observed other officers gain entry into the residence at which point, Salmon entered the residence "to assist." (Tr. 99).

As Salmon entered the residence, Petitioner was "being secured by other officers." (Tr. 99-100). Salmon and Officer Norton then "escorted [Petitioner] immediately out of the residence" and attempted to perform a search of Petitioner before placing him in a police vehicle. (Tr. 99-101). As soon as officers began to search Petitioner, he "immediately began pulling away. . .making it extremely difficult" to effect a search. (Tr. 101). Salmon characterized Petitioner's behavior as "disorderly" and "actively resisting." (Tr. 102). Petitioner was eventually restrained and

3

a search conducted after which officers attempted to place Petitioner in a police vehicle an action which Petitioner "continued to resist." (Tr. 102). Officers were eventually able to place Petitioner in a police vehicle and transport him to the police station. (Tr. 102-03). After arriving at the police station, officers administered to Petitioner a preliminary breath test the results of which revealed that Plaintiff's blood alcohol level was .145. (Tr. 104).

**Andrew Norton**

As of August 19, 2008, Norton was employed as a police officer for the City of Lansing. (Trial Transcript, July 29, 2010, 140). At approximately 3:40 a.m., Norton was dispatched to investigate a report of a home invasion. (Tr. 140). Upon arrival at the scene, Norton observed Petitioner inside the residence. (Tr. 141). Norton, who was wearing a police uniform, began instructing Petitioner to show his hands. (Tr. 141-42). Petitioner responded by "ma[king] a gesture as though he had a gun in his hands, a long gun in his hands, and told [the police officers] to put [their] fucking hands up." (Tr. 141-42). Norton and another officer entered the residence and, after a struggle, were able to handcuff Petitioner. (Tr. 143). Petitioner was then taken outside where Norton attempted to effect a search of Petitioner. (Tr. 143). Petitioner responded by "struggling with" the officers. (Tr. 143). Petitioner was immediately placed on the ground where he continued to struggle. (Tr. 143-44). Officer Norton, with assistance from Officer Salmon, was eventually able to subdue Petitioner and place him in a police vehicle. (Tr. 144). Norton characterized Petitioner's behavior as "actively aggressive." (Tr. 144).

4

**Martha Garrison**[1]

As of August 19, 2008, Martha Garrison was 84 years of age. (Trial Transcript, July 29, 2010, 157-59). On this night, Garrison was awoken by the sound of somebody breaking into her home. (Tr. 157-58). Garrison immediately awoke her husband, Dillard Garrison, and the two began walking down the stairs to investigate. (Tr. 158). Before they reached the bottom of the stairs, Petitioner "started up the steps" and began "swearing at" the Garrisons. (Tr. 158). Petitioner then began "beating" Martha Garrison. (Tr. 158-59). Petitioner struck Martha Garrison on the head "probably eight or ten times." (Tr. 158-59). As a result of this beating, Garrison suffered "quite a few marks" all over her body, a "hurt" back, and a "big lump" on her head. (Tr. 158). Martha and her husband, Dillard Garrison, responded by kicking Petitioner down the stairs. (Tr. 160). Undeterred, Petitioner "came up the stairs again." (Tr. 160). Martha Garrison retreated to her bedroom where she telephoned the police. (Tr. 160). Petitioner did not appear to Garrison to be confused. (Tr. 162). Garrison did not give Petitioner permission to enter her home. (Tr. 159-60).

**Dillard Garrison**

As of August 19, 2008, Dillard Garrison was 85 years of age. (Trial Transcript, July 29, 2010, 164). On this night, Garrison awoke after his wife began shaking him. (Tr. 166-67). Garrison and his wife got out of bed and began walking to the stairwell. (Tr. 167). When Dillard Garrison reached the stairwell, he observed Petitioner "beating on" his wife. (Tr. 167). As a result of this beating, Martha Garrison was "completely bruised" and suffered a "lump on her forehead."

---

[1] Because Martha Garrison was unavailable to testify at Petitioner's criminal trial, her Preliminary Examination testimony was read into the record at Petitioner's criminal trial. (Trial Transcript, July 29, 2010, 156).

5

(Tr. 176).  Martha Garrison was subsequently transported by ambulance to a local hospital where she received treatment.  (Tr. 180-82).

In response to seeing Petitioner beating his wife, Dillard Garrison kicked Petitioner down the stairs.  (Tr. 167-68).  When Garrison told Petitioner to "get the hell out of the house," Petitioner responded, "I'm not leaving."  (Tr. 168).  At some point in this encounter, Petitioner struck Garrison giving him a black eye.  (Tr. 169).  Garrison did not give Petitioner permission to enter his home.  (Tr. 180).

**Khalid Ibrahim**

As of August 2008, Ibrahim and Petitioner shared a residence.  (Trial Transcript, July 30, 2010, 5-6).  Ibrahim met Petitioner in 2006 when they both began graduate school.  (Tr. 6).  Ibrahim and Petitioner "had a lot of classes together."  (Tr. 9).  Ibrahim never witnessed Petitioner drinking or hung over.  (Tr. 6-9).  On August 18, 2008, Ibrahim drove Petitioner to the Dublin Square bar.  (Tr. 10).  At that time, Petitioner appeared to be "absolutely normal" and did not appear to have been drinking previously.  (Tr. 11, 21).  Ibrahim had never witnessed Petitioner consume any illegal drugs or prescription medications.  (Tr. 21).

**Peter Bulik**

Bulik and Petitioner were classmates.  (Trial Transcript, July 30, 2010, 25-26).  On the night of August 18, 2008, Bulik visited the Dublin Square bar where he believed he encountered Petitioner.  (Tr. 26-28).  Bulik later walked to Rick's bar, but did not recall encountering Petitioner at that location.  (Tr. 28-29).

**Timothy Haak**

Timothy Haak is Petitioner's father.  (Trial Transcript, July 30, 2010, 40-41). Petitioner did not experience "problems with alcohol abuse" or "problems with drugs" growing up. (Tr. 43-44).  Petitioner likewise did not exhibit aggressive or violent behavior growing up.  (Tr. 44). Petitioner was arraigned in this matter "around" 2:00 p.m. on August 19, 2008.  (Tr. 44-45). Immediately after Petitioner's arraignment, Timothy Haak drove Petitioner to a hospital so that he could be "drug tested."  (Tr. 46-48).

**Darin Quach**

On August 18, 2008, Quach went to the Dublin Square bar where he encountered Petitioner.  (Trial Transcript, July 30, 2010, 59-63).  Quach observed Petitioner consume alcohol, but Petitioner did not appear drunk.  (Tr. 62-63, 65-67).  Quach later walked to Rick's bar with Petitioner and a group of other people.  (Tr. 63-64).  While there, Quach observed Petitioner consume another drink.  (Tr. 65-66).  Petitioner did not appear to be intoxicated, however.  (Tr. 64).

**Ronnie Cole**

On or about August 11, 2008, Cole went to the Dublin Square bar.  (Trial Transcript, July 30, 2010, 78-80, 85).  While there, Cole "became extremely belligerent with no recollection of drinking much alcohol at all and blacked out."  (Tr. 79).  Subsequent to his August 19, 2008 arrest, Petitioner sent to Cole an email in which Petitioner stated that he "went to Dublin and. . .didn't remember much and wound up in jail, and he was trying to piece evidence together and gather information, just hear from anyone that was there and may have had a similar experience."  (Tr. 81).

7

In response, Cole informed Petitioner that something similar had recently happened to him. (Tr. 81-84). While Cole characterized his experience as "unusual," he conceded that his alcohol tolerance was "way down" on the night in question. (Tr. 83-88). Cole also conceded that he had previously "blacked out from drinking" on previous occasions. (Tr. 88).

**Jessica West**

On the night of August 18, 2008, West went to the Dublin Square bar. (Trial Transcript, July 30, 2010, 93-95). When West awoke the next day she "felt like something was off." (Tr. 96). She remembered leaving the bar, but had "no memory of what happened afterwards." (Tr. 96). West conceded that she "do[es] party" and "do[es] drink," but asserted that she had never before blacked out with complete memory loss. (Tr. 97). West asserted that she did not consume enough alcohol on the night in question to cause her to black out. (Tr. 96). West instead believed that "something" happened to her and remembered that she left her drinks unattended throughout the evening. (Tr. 96, 104-06). West conceded, however, that she consumed "maybe seven" drinks on the night in question. (Tr. 100-01).

**Peterson Haak**

At approximately 4:30 p.m. on August 18, 2008, Petitioner arrived at a party which several classmates also attended. (Trial Transcript, July 30, 2010, 133-35). While at this party, Petitioner consumed two drinks and four glasses of wine. (Tr. 135). Petitioner departed this party at approximately 8:00 p.m. (Tr. 135). Petitioner attended to some errands and then returned home to prepare for the evening. (Tr. 135-37). While he was getting ready, Petitioner consumed four

glasses of sangria.  (Tr. 137).  Petitioner then went to the Dublin Square bar arriving "sometime after" 10:00 p.m.  (Trial Transcript, July 30, 2010, 126-27, 136-37).  Petitioner consumed three drinks shortly after arriving at the Dublin Square bar.  (Tr. 138-39).

Around midnight, Petitioner met up with Robert Hillman and a few other individuals. (Tr. 139-40).  At this point, the group began drinking shots.  (Tr. 140-41).  After drinking his third shot, Petitioner immediately sensed that the shot did not taste like alcohol.  (Tr. 141-42).  Petitioner recalled that "it tasted like nothing I had had before, except all I knew was it was bitter, and it was unusual."  (Tr. 142).  Approximately ten minutes later, Petitioner's "memories for the night ceased almost immediately."  (Tr. 142).  Petitioner asserted that because he was a scientist, he knew he had not consumed a sufficient amount of alcohol to that point to cause him to experience memory loss. (Tr. 142-43).  Petitioner instead asserted that the last shot he consumed had been "spiked."  (Tr. 183).

Petitioner had no recollection at all of later walking to Rick's bar.  (Tr. 128, 143-44). Petitioner had no recollection of stopping for a sandwich after departing Rick's bar.  (Tr. 129, 143-44).  Petitioner had no recollection of later stopping to go to the bathroom while walking home.  (Tr. 130, 143-44).  Petitioner had no recollection of entering the Garrison's residence and striking Martha Garrison.  (Tr. 145-46).  Petitioner had no recollection of his subsequent interaction with the police. (Tr. 147).  Following his arraignment, Petitioner went to the hospital where he had blood drawn for testing.  (Tr. 150-56).  On cross-examination, Petitioner conceded that on the morning of August 18, 2008, he took Adderall, an amphetamine that he was instructed to not take with alcohol.  (Tr. 174).

**Dr. Bernard Eisenga**

Dr. Eisenga is a medical doctor who also received a Ph.D. in pharmacology with a minor in toxicology. (Trial Transcript, August 2, 2010, 6-9). Chloral hydrate is a "sedative" that "will induce sedation and sleep." (Tr. 12). Chloral hydrate is generally used by physicians to sedate children so that a medical procedure can be performed. (Tr. 12-13). Chloral hydrate has also been used for improper purposes. (Tr. 13-14). Specifically, the drug has "been mixed with alcohol containing beverages and used to incapacitate individuals," cause them "to become intoxicated to the point that they had amnesia or they were easily overcome." (Tr. 14). Chloral hydrate can, however, cause individuals to experience "potentially adverse effects" such as sleepwalking, disorientation, incoherence, staggering gait, and hallucinations. (Tr. 15-17). Dr. Eisenga did not, however, know the frequency with which individuals experience such adverse effects. (Tr. 17-18).

Chloral hydrate is "very rapidly metabolized" by the human body. (Tr. 19-20). During the metabolization process, chloral hydrate is transformed into trichloroethanol which "is subsequently released from the liver and goes to the general circulation." (Tr. 18-21). Under normal circumstances, trichloroethanol remains in the blood for 7-12 hours. (Tr. 21). When chloral hydrate is consumed with alcohol, however, the rate at which chloral hydrate is metabolized is slowed "to a certain degree." (Tr. 22-23).

An examination of Petitioner's blood, presumably drawn on August 19, 2008, revealed the presence of trichloroethanol at the level of 2.2 micrograms per milliliter. (Tr. 23-25). The presence of trichloroethanol at a level of between 2 and 12 micrograms per milliliter is considered to be a "therapeutic" level. (Tr. 24-25). Dr. Eisenga concluded that it was unlikely that Petitioner's behavior on the night in question was the result of alcohol alone. (Tr. 27). The doctor

"thought" Petitioner had been poisoned with chloral hydrate or trichloroethylene, a compound which metabolizes into chloral hydrate. (Tr. 27-28). The doctor further noted that while trichloroethylene has been known to be present in groundwater, it would be "virtually impossible" to drink enough water to produce the results of his toxicology analysis. (Tr. 32-35).

On cross-examination, Dr. Eisenga conceded that his opinions and conclusions regarding the adverse effects of chloral hydrate were based upon the results of studies conducted on children aged 6 months to 3 years. (Tr. 40). The doctor further acknowledged that he was not aware of any published research concerning the potential adverse effects of chloral hydrate in adults. (Tr. 41). Dr. Eisenga also acknowledged that Petitioner failed to inform him of the amount of alcohol he consumed on the night in question. (Tr. 44-45). While the doctor was provided the results of the preliminary breath test Petitioner performed, the doctor was also unaware that this preliminary breath test was not conducted until almost four hours after Petitioner claims he last consumed alcohol. (Tr. 45-46).

Dr. Eisenga asserted that while an individual who consumes a certain amount of alcohol may act aggressively, such is "less likely unless they are aggressive to begin with, unless they have an aggressive antisocial type personality to begin with." (Tr. 58). In this regard, the doctor asserted that he did not believe that the consumption of alcohol alone could explain Petitioner's actions on the night in question. (Tr. 57-58). The doctor also conceded, however, that he had not performed a "comprehensive examination" of Petitioner and instead only met with him in person for ten minutes and also spoke with him on the telephone for an additional five minutes. (Tr. 57-59).

**Glenn Wagner**

Wagner, the pastor of a church Petitioner attended for 14 years, indicated that he had known Petitioner for 18 years.  (Trial Transcript, August 2, 2010, 86-87).  Wagner testified that in his opinion Petitioner was "absolutely truthful."  (Tr. 89).  Wagner further opined that Petitioner was not an aggressive or violent person.  (Tr. 90).

**James Resau, Ph.D.**

Resau is a pathologist employed as a research scientist at the Van Andel Institute. (Trial Transcript, August 2, 2010, 92).  Petitioner worked as a laboratory technician under Dr. Resau's supervision.  (Tr. 92).  In this capacity, the two interacted daily.  (Tr. 94).  Resau indicated that he had known Petitioner for at least eight years.  (Tr. 93).  Resau testified that in his opinion Petitioner was "a very responsible, moral, kind, considerate person" and "a top-notch guy."  (Tr. 95). Dr. Resau further testified that Petitioner is not an aggressive person.  (Tr. 95).

**Travis Devlin**

Devlin met Petitioner in 1998 when the pair were undergraduate students.  (Trial Transcript, August 2, 2010, 97-98).  In the time since, the pair became friends and regularly associated.  (Tr. 98-99).  Devlin indicated that in his opinion Petitioner was "truthful, honest, and is a general good person."  (Tr. 99).  Devlin also testified that Petitioner is not an aggressive person. (Tr. 99).

12

**Jennifer Haak**

Jennifer Haak is Petitioner's sister-in-law.  (Trial Transcript, August 2, 2010, 101).

Jennifer Haak met Petitioner in 1999.  (Tr. 101-02).  Haak reported that in her opinion Petitioner "is

absolutely truthful" and "full of integrity."  (Tr. 102-03).  Haak further reported that Petitioner was

not an aggressive or violent person.  (Tr. 103).


**Karla Walker, Ph.D.**

Walker earned a Ph.D. in "pharmacy" and is employed as the director of the

laboratory in which Petitioner's blood samples were tested.  (Trial Transcript, August 3, 2010, 4-10).

The laboratory was instructed to "run the test for the chloral hydrate."  (Tr. 10-12).  The equipment

on which Petitioner's blood was tested was properly calibrated prior to use.  (Tr. 12-16, 33-37).

Because chloral hydrate quickly metabolizes into trichloroethanol, the test the laboratory performed

measured the level of trichloroethanol present in Petitioner's blood.  (Tr. 12-13, 18-20, 46-47).

Laboratory testing revealed the presence of trichloroethanol in Petitioner's blood at the level of 2.2

micrograms per milliliter.  (Tr. 21).

Dr. Walker identified three possible causes to explain the presence of trichloroethanol

in Petitioner's blood: (1) ingestion of chloral hydrate; (2) trichloroethylene exposure; or (3) exposure

to a solvent, such as trichloroethane or methylchloroform, that metabolizes to trichloroethanol.  (Tr.

47).  The doctor could not determine the source of the trichloroethanol present in Petitioner's blood.

(Tr. 50).  Dr. Walker also reported that there exist certain other sedatives, both legal and illegal, the

presence of which would not have been revealed by the tests the laboratory performed on Petitioner's

blood.  (Tr. 51-54).

13

**Dr. Michael Clark**

Dr. Clark is a physician who, on August 19, 2008, was working in the emergency room at Sparrow Hospital. (Trial Transcript, August 3, 2010, 64-65). At approximately 3:26 p.m., Petitioner arrived at the emergency room. (Tr. 66). Following an initial examination performed by someone else, Petitioner was examined by Dr. Clark. (Tr. 69). Petitioner reported to the doctor that he assaulted an "elderly lady" earlier that day. (Tr. 70). When asked by the doctor, "what happens when you drink?," Petitioner responded, "I get quieter." (Tr. 70). Petitioner also reported that "nothing like that" had ever happened before. (Tr. 70-71). Unsure why an individual would "have this kind of reaction to drinking," Dr. Clark "proceeded to do a further workup" to assess whether Petitioner's behavior might have been the product of an organic impairment. (Tr. 70-71). The results of a CAT scan were normal. (Tr. 76). The doctor also wanted certain toxicology testing performed. (Tr. 72-75). Petitioner provided blood and urine samples which were sent to an "outside lab" where the requested testing was performed. (Tr. 72-77, 81-88).

Dr. Clark indicated, however, that his assessment of the situation was based on Plaintiff's statement to a physician's assistant that he "had a few drinks, approximately six, over a period of many hours." (Tr. 92). When Dr. Clark was asked whether his assessment of Petitioner would have been "impacted" had he known that Petitioner "had 15 drinks as opposed to 6," the doctor responded, "it probably would have." (Tr. 92). The doctor further stated that "fifteen drinks is severely intoxicated." (Tr. 92). When Dr. Clark was asked if the amount of alcohol Petitioner consumed "would possibly have explained" Petitioner's allegations that he was able to remember only "bits and pieces" of the night in question, the doctor stated, "that may have something to do with it, yes." (Tr. 90-92).

14

**Dr. Phillip Margolis**

On February 13, 2009, Dr. Margolis, a psychiatrist, conducted an examination of Petitioner. (Trial Transcript, August 3, 2010, 101-07). Petitioner acknowledged to Dr. Margolis that he consumed "at least 13 drinks" on the night in question. (Tr. 110). Petitioner asserted to the doctor "that at midnight he was slipped a Mickey Finn" shortly after which he "kind of blacked out." (Tr. 110-12). Petitioner nevertheless remembered walking down the street with Robert Hillman, entering the Garrison's residence, and subsequently encountering the police. (Tr. 112-14).

Dr. Margolis concluded that Petitioner had been poisoned with chloral hydrate and, therefore, was not criminally responsible for his actions on the night in question. (Tr. 115-22). The doctor conceded, however, that he was not a toxicologist and, therefore, could not comment on how alcohol and chloral hydrate interact. (Tr. 128). Dr. Margolis also conceded that his opinion was based upon statements made by Petitioner and "his colleagues" about what occurred on the night in question. (Tr. 128).

**Steven Harris, Ed.D.**

On January 26, 2009, Dr. Harris, a psychologist, conducted an examination of Petitioner. (Trial Transcript, August 5, 2010, 4-10). The doctor concluded that Petitioner's behavior on the night in question was "disproportionate, would be in excess of what you would expect of someone at a blood alcohol concentration of .145." (Tr. 19). Dr. Harris indicated that this particular conclusion was not based solely on Petitioner's blood alcohol level, but also considered many other factors including the results of his clinical interview of Petitioner as well as input from Petitioner's family. (Tr. 19-20). Petitioner's performance on various psychological tests was "very consistent

15

with [Dr. Harris'] clinical impressions."  (Tr. 47).  The doctor concluded, despite Petitioner's

concession that his alcohol consumption "increased" once he began graduate school, that Petitioner's

behavior did not satisfy the criteria of "alcohol dependence or alcohol abuse."  (Tr. 50-51).

Dr. Harris concluded that Petitioner was legally insane at the time he committed the

acts giving rise to the criminal charges against him.  (Tr. 51-52).  Specifically, the doctor concluded

that Petitioner, during the relevant time period, was suffering from "a substance induced delirium

state."  (Tr. 52-55).  When asked whether Petitioner could "appreciate the wrongfulness of his

actions," Dr. Harris responded:

> No. In my opinion, all of the evidence indicates that he had - that his
> reality impairment was substantial, was significant, that he was
> unable to discern what was real from what was unreal, that he was in
> an agitated state, that he was disoriented, that he was delusional, that
> he was experiencing either illusions, if not hallucinations, at the time,
> in other words, meets the definition for mental illness.

(Tr. 55-56).

With respect to whether Petitioner's behavior could be explained by his consumption

of alcohol on the night in question, Dr. Harris reiterated:

> In my opinion, that behavior is far in excess of what one would see
> at a blood alcohol concentration of .145.  And that's when the
> diagnosis of substance intoxication delirium is actually made is when
> behaviors of disproportionate to, in excess of, not consistent with
> behavior that you would expect to see at a .145 blood alcohol
> concentration.

(Tr. 56).

On cross-examination, Dr. Harris conceded that he had never observed Petitioner

when he is intoxicated and, moreover, that alcohol consumption can cause "some people" to

experience mood swings and aggression.  (Tr. 57-59, 73-74).  The doctor also conceded that his

16

opinions were premised "entirely" on his "assumption" that Petitioner was "involuntarily drugged" with chloral hydrate. (Tr. 74-76). In this respect, Dr. Harris indicated that in his experience, chloral hydrate was not a "recreational drug" or "drug of choice." (Tr. 98). With respect to Petitioner's assertion that he remembered certain discreet portions of the night in question, including his encounter with the Garrisons, Dr. Harris stated:

> It doesn't mean that his reality impairment was not significantly compromised and impaired. It just means that he recalls bits and pieces from that scene. A person in a psychotic state, it's not as though they have no memory of actual events.

(Tr. 77-81).


**George Daigle, Ph.D.**

On March 6, 2009, Dr. Daigle, a psychologist, conducted an examination of Petitioner. (Trial Transcript, August 5, 2010, 100-02). The doctor found Petitioner to be "rather earnest. . .making every effort to convey as much information as he could. . .." (Tr. 104-13). Petitioner asserted to Dr. Daigle that "he must have been drugged because his conduct at the time of this incident was unlike his previous behavior as he knew it." (Tr. 114).

With respect to the question whether Petitioner was criminally responsible for his actions on the night in question, Dr. Daigle indicated that he was "leaving it up to the jury to decide whether or not [Petitioner] was involuntarily drugged to the point it made him mentally ill." (Tr. 134). In this regard, the doctor further stated:

> [Petitioner] was clearly in an intoxicated state, which would impair his ability to recognize the wrongfulness of his conduct, to control his behavior. The question would be, did that occur on a voluntary or involuntary basis? The only information I have by [Petitioner's]

17

report is that he consumed alcohol voluntarily and he was alcohol
intoxicated.

(Tr. 134).


**William Atchison, Ph.D.**

Atchison earned a Ph.D. in pharmacology and toxicology.  (Trial Transcript, August
6, 2010, 12).  Trichloroethanol is produced as a result of the metabolism of "several drugs and
chemicals" including chloral hydrate and trichloroethylene.  (Tr. 17-18).  Trichloroethylene is a
known contaminant.  (Tr. 18-20).  Dr. Atchison had no knowledge as to the amount of
trichloroethylene present in the East Lansing or Michigan State University water supply.  (Tr. 20).
The doctor did testify, however, that in terms of "environmental contamination for
trichloroethylene," the state of Michigan ranked in "the top five" nationally.  (Tr. 20).  Dr. Atchison
agreed that ingestion of trichloroethylene or chloral hydrate were both possible explanations for why
testing of Petitioner's blood revealed the presence of trichloroethanol.  (Tr. 20-21).

With respect to the potential for "paradoxical effects" from chloral hydrate, there have
been "several studies in young children which have documented that chloral hydrate can produce
paradoxical reactions."  (Tr. 24).  These studies indicated that approximately eighteen percent of
children reacted to chloral hydrate by exhibiting "agitation" rather than the expected "sedation,
drowsiness and sleepiness."  (Tr. 24-26).  There exist several differences, however, in how a drug
is processed by a child as compared with a 28-year old man.  (Tr. 27).  First, the liver, which is
responsible for metabolizing chemicals such as trichloroethylene or chloral hydrate, is "not
developed in terms of its complete function in very young children."  (Tr. 27).  Second, the "blood

18

brain barrier, which is something which keeps some chemicals out of the brain, is not completely developed in very young children." (Tr. 27-28). Finally, "in young children the nervous system is still in development, and so it's, it's not completely developed, and as a result, drugs can have more pronounced effects in infants and small children." (Tr. 28). Dr. Atchison was unable to locate any studies "on the rates of paradoxical effects on adults for chloral hydrate." (Tr. 28).

Dr. Atchison testified that given the rate at which chloral hydrate metabolizes, "it would be difficult to envision" a circumstance in which it took more than three hours for chloral hydrate to effect a person who had ingested such. (Tr. 32-33). The doctor opined that a blood alcohol level of .145 "is a moderate dose of ethanol, and certainly, one would expect to be quite impaired or one could be quite impaired at .145." (Tr. 34). Dr. Atchison concluded that Petitioner's conduct on the night in question "would be consistent with" someone who had a blood alcohol level in the .145 range. (Tr. 37-38). On cross-examination, the doctor conceded that he was not a physician and had never diagnosed or treated any person for poisoning or alcohol-related problems. (Tr. 38-39).

**Henry Loria**

As of August 19, 2008, Loria was employed as a registered nurse working in the emergency department of Sparrow Hospital. (Trial Transcript, August 6, 2010, 64-65). At approximately 3:30 p.m., Petitioner entered the emergency department seeking treatment. (Tr. 66-68). Loria was the first person to speak with Petitioner and assess his situation. (Tr. 67-68). Petitioner requested treatment for his wrist and ankle. (Tr. 67-68). Petitioner refused to elaborate or describe what necessitated his emergency department visit. (Tr. 68). Petitioner never indicated

19

to Loria that he may have been drugged the previous evening.  (Tr. 68).

**Scott Despins**

As of September 9, 2008, Despins was employed as a police officer for the City of East Lansing.  (Trial Transcript, August 6, 2010, 73).   On that afternoon, Petitioner went to the police department and spoke with Officer Despins.  (Tr. 73-74).  Petitioner informed Despins that "some type of incident had occurred, and he felt the reason the incident occurred was that he had been drugged while he was at Dublin's Square."  (Tr. 74).

Despins attempted to complete a police report and asked Petitioner to provide him with "the entire story, you know from beginning to end, you know, where his day started until, you know, the incident that led up to the drugging and thereafter."  (Tr. 75).  Petitioner, however, declined to describe to Officer Despins anything that occurred prior to 10:30 p.m. on the night in question.  (Tr. 76-79).  Also, when Despins asked Petitioner if he knew what his blood alcohol content was on the night in question, Petitioner responded that such information was "irrelevant." (Tr. 76).  Officer Despins eventually received from Petitioner a written statement which was forwarded to a detective for investigation.  (Tr. 76-84).

**Sharon Lake**

As of August 19, 2008, Lake was employed as a registered nurse in the Sparrow Hospital emergency department.  (Trial Transcript, August 9, 2010, 5-6).  At approximately 3:30 p.m. Petitioner arrived at the emergency department.  (Tr. 6-7).  Petitioner initially reported that he was seeking treatment for ankle and wrist pain, but when Lake later examined Petitioner, he reported

20

that "the real reason" he reported to the emergency department was to be drug tested.  (Tr. 6-8).

Petitioner reported that "he had been involved in an assault" and that his behavior "was very unusual

for him."  (Tr. 8).  Petitioner reported that "he figured something must have been put in his drink."

(Tr. 8).  Petitioner did not indicate where or when he believed he had been drugged.  (Tr. 9-10).

        Following the presentation of evidence, the jury found Petitioner guilty but mentally

ill of first degree home invasion, aggravated assault, and resisting or obstructing a police officer.

(Trial Transcript, August 10, 2010, 4-5).  Petitioner was sentenced to serve concurrent sentences of:

(1) 36-240 months; (2) 16-24 months; and (3) 12 months, respectively.  (Sentencing Transcript,

September 22, 2010, 45).[2]  Petitioner appealed his conviction to the Michigan Court of Appeals

asserting the following claims:

> I.      The evidence was insufficient to sustain the verdict because the defense of legal insanity was proven by a preponderance of the evidence, which showed Defendant was involuntarily intoxicated due to chloral hydrate poisoning.
>
> II.     The great weight of the evidence demonstrates that the verdict should have been not guilty by reason of insanity.
>
> III.    The evidence was insufficient to sustain the convictions due to the lack of proof of each element of the offense of resisting or obstructing the police, and lack of proof of intent for all three offenses.
>
> IV.    Defendant was denied his constitutional right to the due process of law when the jury found him guilty but mentally ill instead of not guilty by reason of insanity which was contrary to the evidence and resulted in an improper compromise verdict.

---

[2]  Petitioner was released from custody on September 24, 2013.  (Dkt. #32 at PageID.236).

V.   The testimony of a prosecution witness offered as an expert was improperly admitted due to his lack of qualifications and an insufficient factual and scientific basis.

VI.   The prosecutor's improper remarks to the jury and prosecutorial misconduct during closing argument were highly prejudicial and denied Defendant his due process right to a fair trial.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Haak*, 2011 WL 6187044 (Mich. Ct. App., Dec. 13, 2011).  Asserting the following issues, Petitioner moved in the Michigan Supreme Court for leave to appeal:

I.   When considering the evidence under the preponderance standard of MCL 768.21a, the great weight of the evidence demonstrates that the verdict should have been not guilty by reason of insanity and leave granted or reversal should result.

II.   Where Defendant has proven by a preponderance of the evidence he was rendered temporarily legally insane due to involuntary chloral hydrate poisoning, the evidence is insufficient to sustain the verdict of guilty but mentally ill and reversal or leave granted should result.

III.   The testimony of a prosecution witness offered as an expert was improperly admitted due to a discovery violation, his lack of qualifications and an insufficient factual and scientific basis for his testimony.

IV.   Reversal or leave granted should result where the prosecutor's improper remarks to the jury and prosecutorial misconduct during closing argument were highly prejudicial, constituted reversible error and denied Defendant his due process right to a fair trial.

V.   Reversal or granting leave should result where the prosecution's evidence was insufficient to sustain the

22

convictions due to the lack of proof of each element of the offense of resisting or obstructing the police, and where there was an utter lack of proof of intent for all offenses due to the affirmative defense of legal insanity.

The court denied Petitioner leave to appeal. *People v. Haak*, Case No. 144494, Order (Mich., May 21, 2012). On March 1, 2013, Petitioner initiated the present action asserting the following claims:

I.  Prosecutorial misconduct during closing argument, whether the instances are considered standing alone or cumulatively, deprived Petitioner of his constitutional right to due process and a fair trial. The state court's decision of this issue resulted from an unreasonable application of federal law.

II.  The state court unreasonably applied federal law concerning the claim of insufficiency of evidence because Petitioner established by a preponderance of the evidence that he was legally insane at the time of the incident and no rational juror could have found otherwise.

III.  Where Petitioner has proven by a preponderance of the evidence that he was rendered temporarily legally insane due to involuntary chloral hydrate poisoning, the evidence is insufficient to sustain the verdict of guilty but mentally ill and the state court's decision to the contrary was an unreasonable application of federal law and an unreasonable determination of the facts in light of the evidence presented.

IV.  Where Petitioner has proven by a preponderance of the evidence that he was legally insane due to an involuntary poisoning, the evidence is insufficient to sustain the convictions because of a lack of proof of intent, a required statutory element of each of the three offenses charged.

V.  The testimony of a prosecution witness offered as an

23

expert was improperly admitted due to his lack of qualifications and an insufficient factual and scientific basis for his testimony, and as a result, the trial was so fundamentally unfair as to deprive Petitioner of his constitutional right to due process of law.  The state court's decision to the contrary was an unreasonable application of federal law.

## STANDARD OF REVIEW

Haak's petition is subject to the provisions of the Antiterrorism and Effective Death

Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive

standards for granting habeas relief under the following provisions:

> (d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
> >
> > (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to

"prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law

when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that

adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state

court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.** **Prosecutorial Misconduct** (Habeas Claim I)

Petitioner argues that his right to a fair trial was violated by numerous instances of prosecutorial misconduct. Specifically, Petitioner asserts that the prosecutor engaged in the following forms of misconduct: (1) denigrated the insanity defense; (2) denigrated the defense experts; (3) made incorrect statements regarding the burden of proof; (4) made arguments contrary to the evidence; (5) conducted an improper rebuttal demonstration; and (6) offered improper expressions of personal opinion. These arguments, with the exception of issues (3) and (5), have been procedurally defaulted precluding review by this Court.

A.    Procedural Default

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address a petitioner's claims because of a failure to satisfy state procedural requirements. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Where a petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court. *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989). If a claim has been procedurally defaulted, federal habeas review is available only if the petitioner can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice. *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004) (citing *Coleman*, 501 U.S. at 750).

The Sixth Circuit employs a multi-part test to determine if a petitioner has procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply; (2) the last state court rendering a judgment in the matter must have actually enforced the state procedural rule; (3) application of the procedural rule in question must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim; and (4) the petitioner cannot demonstrate cause and prejudice excusing the default. *See Tolliver v. Sheets*, 594 F.3d 900, 928 n.11 (6th Cir. 2010).

Petitioner concedes that the only arguments he properly reserved in state court are issues (3) and (5) above, specifically that the prosecution in closing argument incorrectly described the burden of proof and conducted an improper demonstration. The Michigan Court of Appeals

28

likewise determined that these were the only prosecutorial misconduct claims which Petitioner properly preserved. *Haak*, 2011 WL 6187044 at *5. With respect to Petitioner's other prosecutorial misconduct claims, the court stated that "[u]npreserved issues of alleged prosecutorial misconduct are reviewed for plain error affecting [Petitioner's] substantial rights." *Id.*

The fact that the Michigan Court of Appeals reviewed Petitioner's unpreserved claims for plain error does not constitute an adjudication on the merits which can overcome procedural default. *See, e.g., Frazier v. Jenkins*, 770 F.3d 485, 496 n.5 (6th Cir. 2014) ("[w]e have repeatedly held that plain-error review is not equivalent to adjudication on the merits"); *Girts v. Yanai*, 501 F.3d 743, 755 (6th Cir. 2007) ("[p]lain error review [by a state appellate court] does not constitute a waiver of state procedural default rules"). Petitioner, citing to *Mitts v. Bagley*, 620 F.3d 650 (6th Cir. 2010), *rev'd on other grounds*, *Bobby v. Mitts*, 131 S.Ct. 1762 (2011), argues that despite his failure to comply with Michigan procedural rules and the reliance thereon by the Michigan Court of Appeals, this Court can nevertheless address the merits of his unpreserved prosecutorial misconduct claims. The Court finds Petitioner's reliance on *Mitts* to be unpersuasive.

In *Mitts*, the Sixth Circuit examined whether review by an Ohio state court for "plain error" constituted a review on the merits of a federal claim thus precluding application of the procedural default doctrine. *Id.* at 655-56. The *Mitts* court found that the "plain error" analysis by the Ohio court of the claim in question was not based solely on Ohio's waiver rules, but also incorporated federal law principles. *Id.* at 656. Accordingly, the state court's analysis was not sufficiently independent of federal law to bar review on the merits, on procedural default grounds, by a federal habeas court. *Id.*; *see also*, *Conley v. Knab*, 2011 WL 3876533 at *8 n.3 (S.D. Ohio, July 25, 2011). Here, the Michigan Court of Appeals found that Petitioner failed to preserve certain

29

of his claims based solely on Michigan law. There is no suggestion or indication that this determination, or the subsequent "plain error" analysis, relied on or was informed by federal law. Thus, unlike in *Mitts*, the analysis by the Michigan Court of Appeals of the claims in question was independent of federal law and, therefore, it cannot be said that the court reviewed the claims on the merits.

Procedural default can be excused, however, in either of two circumstances: (1) where there exists cause for the default and prejudice resulting therefrom, or (2) a miscarriage of justice will result if the procedural default is enforced. *Sutton v. Carpenter*, 745 F.3d 787, 789-90 (6th Cir. 2014). Petitioner does not argue the existence of cause and prejudice, but instead asserts that he satisfies the miscarriage of justice exception. To satisfy this exception, however, Petitioner must show that he is actually innocent of the crimes of which he was convicted. *See Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). Petitioner has advanced no argument that he is actually innocent, but instead argues that the miscarriage of justice exception "may potentially be extended beyond cases of actual innocence."

In support of this argument, Petitioner cites only to a single secondary authority which the Court notes does not even appear to support Petitioner's argument to extend the scope of the miscarriage of justice exception. According to Petitioner, the source in question supports the proposition that "in our collateral review jurisprudence, the term miscarriage of justice means that the defendant is actually innocent, but in other criminal contexts the phrase has wider meaning extending to any error that seriously affects the fairness, integrity or public reputation of judicial proceedings. . .independently of the defendant's innocence." A habeas proceeding constitutes collateral review, thus, as the cited source states, miscarriage of justice in the present circumstance

"means that the defendant is actually innocent." Accordingly, the Court finds that review of the following claims is precluded by Petitioner's procedural default: (1) denigration of the insanity defense; (2) denigration of the defense experts; (3) arguments contrary to the evidence; and (4) expressions of personal opinion. The Court will, however, review on the merits Petitioner's other two prosecutorial misconduct claims: (1) incorrect statements regarding the burden of proof; and (2) improper rebuttal demonstration.

      B.      Prosecutorial Misconduct Standard

      When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Petitioner must do more than show that the prosecutor's conduct was "undesirable or even universally condemned." *Darden*, 477 U.S. at 181. Instead, Petitioner must demonstrate that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*; *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219).

      The Supreme Court has recently emphasized that "the *Darden* standard is a very general one, leaving courts 'more leeway. . .in reaching outcomes in case-by-case determinations.'" *Parker v. Matthews*, 132 S.Ct. 2148, 2155 (2012). Furthermore, the standard regarding a prosecutorial misconduct claim "is a high one." *Bales v. Bell*, 788 F.3d 568, 579 (6th Cir. 2015). The Court's role "is not to supervise the state court but to ensure that the state court has not

contradicted federal law so as to deny a petitioner due process." *Id.* (citing *Darden*, 477 U.S. at 181). As if to underscore these points, the Supreme Court has recently admonished the Sixth Circuit for resolving prosecutorial misconduct claims, raised in petitions for writ of habeas corpus, by reliance on circuit court authority and self-created multi-factor tests. *Parker*, 132 S.Ct. at 2155.

C.      Statements Regarding Petitioner's Burden of Proof

Petitioner asserts that he is entitled to relief because the prosecutor made inappropriate comments regarding his burden of proof to establish the affirmative defense that he was legally insane when he committed the crimes in question. While Petitioner has identified in his brief the portions of the record which support several of his procedurally defaulted prosecutorial misconduct claims, he has failed to identify the portion(s) of the record on which this claim is based. Accordingly, the Court has referenced the brief Petitioner filed with the Michigan Court of Appeals to determine the basis for this particular claim.

Under Michigan law, it is an affirmative defense to a criminal charge that the defendant was "legally insane when he or she committed the acts constituting the offense." Mich. Comp. Laws § 768.21a(1). An individual is legally insane if, as a result of a "mental illness" or "intellectual disability,"[3] that person "lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law." Mich. Comp. Laws § 768.21a(1). A criminal defendant "has the burden of proving the defense of insanity by a preponderance of the evidence." Mich. Comp. Laws §

---

[3] Petitioner has not asserted that he satisfied the definition of "intellectual disability" and there is no evidence in the record that would support such an argument. *See* Mich. Comp. Laws § 330.1100b.

768.21a(3).

In his closing argument, the prosecuting attorney stated, "And I want you to also be aware of the fact that this definition of legal insanity is a very high hurdle. . ." (Trial Transcript, August 9, 2010, 64). The Michigan Court of Appeals rejected Petitioner's argument that the prosecutor's statement misstated his burden to prove by a preponderance of the evidence that he was legally insane. Specifically, the court concluded:

> The prosecutor's reference to a "high hurdle" was not characterizing Haak's burden of proof. Rather, the prosecutor was explaining that Haak must not only establish that he was mentally ill, but also establish that he was unable to conform his behavior or appreciate the nature and quality or wrongfulness of his conduct. Further, we see nothing in the record to overcome the presumption that the jury followed the court's clear instructions on Haak's burden of proof.

*Haak*, 2011 WL 6187044 at *7.

This characterization of the subject comments is consistent with the prosecutor's subsequent argument in which he argued that Defendant had failed to establish that he was both mentally ill and unable to appreciate the wrongfulness of his conduct. (Trial Transcript, August 9, 2010, 65-68). Moreover, even if it is assumed that the comments in question misstated Petitioner's burden of proof, such does not entitle Petitioner to relief. The comment was vague and isolated. Also, the trial court properly instructed the jury on Petitioner's burden with respect to the affirmative defense of legal insanity. (Tr. 86-90). As the Michigan Court of Appeals recognized, jurors are presumed to follow their instructions, *see Bales*, 788 F.3d at 579, and Petitioner has articulated no rationale for concluding otherwise in this case.

The Michigan Court of Appeals rejected this particular claim. In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an

unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

### D.      Prosecution's Rebuttal Demonstration

As previously noted, Petitioner conceded at trial that on the day in question he consumed at least 16 drinks.  During his rebuttal argument, the prosecutor displayed for the jury sixteen glasses.  (Trial Transcript, August 9, 2010, 74-75).  The trial court denied Petitioner's objection to this display on the ground that it was "argument."  (Tr. 75).  The court also admonished the jury to "base your decision on the facts in the evidence and what you recall the evidence to show."  (Tr. 75).

Petitioner argues that this demonstration denied him of the right to a fair trial because the glasses in question were of "varying sizes" and some were "very large, well beyond the reality of the trial testimony."  There is nothing in the record, however, to substantiate this argument.  While Petitioner objected to the size of at least some of the glasses the prosecutor was using, there is nothing in the record establishing that the glasses were, in fact, "beyond the reality of the trial testimony."

The Michigan Court of Appeals denied Petitioner's claim noting that "[b]ecause the demonstration was not an exhibit admitted at trial, and the jury was instructed that it could only consider evidence that was properly admitted when rendering their verdict, it was not necessary that the admissibility requirements be met."  *Haak*, 2011 WL 6187044 at *7.  The court concluded, therefore, that Petitioner's right to a fair trial had not been violated.  *Id.*  In light of the above

34

authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## II.        Sufficiency of the Evidence  (Habeas Claims II-IV)

Petitioner asserts three separate arguments that his convictions are based on insufficient evidence and, therefore, violate his right to due process. Specifically, Petitioner asserts that: (1) he proved the defense of legal insanity by a preponderance of the evidence; (2) because Petitioner proved that he was legally insane, his convictions of guilty but mentally ill are not supported by sufficient evidence; and (3) because Petitioner proved that he was legally insane, there existed insufficient evidence to establish the intent element of the crimes in question.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury.  *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it

does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

### A.     Legal Insanity

Petitioner asserts that "the evidence was not sufficient. . .to prove he was not legally insane." Petitioner argues that the failure by the state courts to find that he did, in fact, establish that he was legally insane when he committed the crimes in question violates the due process principle that criminal convictions be supported by sufficient evidence.  This claim is not cognizable in a federal habeas proceeding.

It is well understood that habeas relief cannot be based upon an alleged violation of state law.  Instead, habeas relief is warranted only where the petitioner is being held in violation of "the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254.  In the context of a sufficiency of the evidence claim, it is necessary to distinguish between the elements and non-elements of the convictions in question.  Challenges to the sufficiency of the evidence concerning an element of a crime implicate the due process concerns articulated above. *See, e.g., Johnigan v. Elo*, 207 F.Supp.2d 599, 611 (E.D. Mich. 2002).  However, challenges to the sufficiency of the evidence regarding non-elements of a crime, do not implicate cognizable due process concerns. *See, e.g., Duffy v. Foltz*, 804 F.2d 50, 54 (6th Cir. 1986) (the due process guarantee that a conviction be based upon sufficient evidence extends only to the elements of the crime and not to the state's burden to disprove an affirmative defense); *Allen v. Redman*, 858 F.2d 1194, 1198 (6th Cir. 1988) (same); *Davis v. Sherry*, 2010 WL 3238906 at *1 (W.D. Mich., Aug. 16, 2010) (same); *Johnigan*,

36

207 F.Supp.2d at 611 (same).

The analysis is different where an affirmative defense "negates an element" of crime. In such a circumstance, due process requires that the state "disprove that defense as part of its burden of proof." *Johnigan*, 207 F.Supp.2d at 611-12.  In Michigan, however, a defendant's sanity (or lack thereof) is not an element of any of the crimes of which Petitioner was convicted.  *See* Mich. Comp. Laws §§ 750.110a(2), 750.81a(1), 750.479(1).  Accordingly, Petitioner's claim that there was insufficient evidence to prove he was not legally insane is not cognizable.

B.      Guilty but Mentally Ill

Petitioner next asserts that there was insufficient evidence to support the jury's verdict that he was guilty but mentally ill of the crimes in question.  To better understand Petitioner's argument, it is helpful to understand the distinction between the defense of legal insanity and the verdict of guilty but mentally ill.

As noted above, under Michigan law, an individual is legally insane if, as a result of a "mental illness," that person "lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law." Mich. Comp. Laws § 768.21a(1).  Mental illness for purposes of this statute is defined as "a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life."  Mich. Comp. Laws § 330.1400(g).

An individual cannot be found legally insane where they are under the influence of voluntarily consumed drugs or alcohol.  *See* Mich. Comp. Laws § 768.21a(2); *People v. Caulley*, 494

N.W.2d 853, 858 (Mich. Ct. App. 1993) ("an individual who is voluntarily intoxicated does not have grounds for an absolute defense based upon his insanity").  On the other hand, involuntary intoxication can support a claim of legal insanity, but only where "the involuntary use of drugs created a state of mind equivalent to insanity."  *Caulley*, 494 N.W.2d at 858.  As previously noted, the defendant bears the burden to prove that he was legally insane when the crime in question was committed.

Under Michigan law, a jury may find a criminal defendant guilty but mentally ill if it finds the following: (1) the defendant is guilty beyond a reasonable doubt of an offense; (2) the defendant has proven by a preponderance of the evidence that he was mentally ill when he committed the offense; and (3) the defendant has not established by a preponderance of the evidence that he "lacked the substantial capacity either to appreciate the nature and quality or the wrongfulness of his conduct or to conform his conduct to the requirements of the law."  Mich. Comp. Laws § 768.36(1).  In sum, therefore, the difference between legal insanity and guilty but mentally ill is whether the defendant has met his burden to establish that due to mental illness he "lacked the substantial capacity either to appreciate the nature and quality or the wrongfulness of his conduct or to conform his conduct to the requirements of the law."

Petitioner argues that "there simply was no evidence of mental illness alone," but rather the evidence proved that he "was insane at the time of the alleged offenses as a result of chloral hydrate poisoning."  The Court discerns two shortcomings in Petitioner's argument.  First, contrary to Petitioner's argument, the jury was not compelled to conclude that Petitioner was insane when he committed the offenses in question.  Second, even if it is assumed that Petitioner lacked the ability to appreciate the nature of his conduct or conform his conduct to the requirements of the law

38

(i.e., he was insane), there was more than sufficient evidence for a rational juror to conclude that such was produced by Petitioner's excessive - and voluntary - intake of alcohol rather than from an allegedly involuntary ingestion of chloral hydrate.

For example, while Dr. Eisenga testified that chloral hydrate can cause people to experience "potentially adverse effects," he conceded that he did not know the frequency with which people suffer such adverse affects. Dr. Eisenga also conceded that his opinions were based upon studies conducted on infants and very young children rather than adults. As Dr. Atchison testified, because there exist significant biological and developmental differences between children and adults, drugs can produce more pronounced effects in children as compared to adults. Dr. Eisenga conceded that he was not aware of any published research concerning the potential adverse effects of chloral hydrate in adults. Dr. Eisenga acknowledged that Petitioner failed to inform him of the amount of alcohol he consumed on the night in question. Finally, Dr. Eisenga conceded that he had spoken with Petitioner for a grand total of only fifteen minutes.

Dr. Walker testified that while her lab tested Petitioner's blood for the presence of trichloralethanol, there exist other sedatives, both legal and illegal, the presence of which would not have been revealed by the tests her laboratory performed. Dr. Clark testified that his opinions were informed by Petitioner's statement that he "had a few drinks, approximately six, over a period of many hours." Dr. Clark conceded that his opinions would "probably" have been "impacted" had he known the true extent of Petitioner's alcohol consumption on the night in question. In this respect, Dr. Clark stated that "fifteen drinks is severely intoxicated" and "would possibly have explained" Petitioner's allegations that he was able to remember only "bits and pieces" of the night in question.

While Petitioner testified that had no recollection of: (1) walking to Rick's bar; (2)

stopping for a sandwich after departing Rick's bar; (3) stopping to go to bathroom while walking home; (4) entering the Garrison's residence and striking Martha Garrison; or (5) his subsequent interaction with the police, Dr. Margolis testified that Petitioner remembered walking down the street with Robert Hillman, entering the Garrison's residence, and subsequently encountering the police. Dr. Margolis offered the opinion that Plaintiff had been poisoned with chloral hydrate, but conceded that he could not comment on how alcohol and chloral hydrate interact.  Finally, Dr. Atchison testified that given the rate at which chloral hydrate metabolizes, "it would be difficult to envision" a circumstance in which it took more than three hours for chloral hydrate to effect a person who had ingested such.  Dr. Atchison further testified that Petitioner's conduct on the night in question "would be consistent with" someone who had a blood alcohol level in the .145 range.  Accordingly, this argument is rejected.

### C.      Intent

Finally, Petitioner argues that "the evidence was insufficient to sustain the convictions of home invasion, assault and resisting/obstructing the police because of the prosecution's failure to prove beyond a reasonable doubt the element of intent."  Specifically, Petitioner argues that because he was legally insane when he acted, he "could not have had the intent to engage in the conduct leading to the charges against him."

As discussed in the preceding section, however, the jury reasonably determined that Petitioner failed to establish that he was legally insane when he committed the crimes in question. To the extent that Petitioner was mentally ill, but not legally insane, such does not preclude a finding that Petitioner acted with the requisite intent.  *See Lang v. Warren*, 2015 WL 3837796 at *6 (E.D.

Mich., June 22, 2015) ("under Michigan law evidence of mental incapacity short of insanity cannot be used to avoid or reduce criminal responsibility by negating specific intent"). Furthermore, a review of the elements of the crimes of which Petitioner was convicted reveals that there existed sufficient evidence to support Petitioner's convictions.

> 1.    First Degree Home Invasion

Petitioner argues that his conviction for First Degree Home Invasion must be vacated because he did not break and enter a dwelling "with the intent to commit a felony, larceny or assault." Petitioner's argument fails to recognize, however, that establishing this particular intent is only one of several ways to prove that an individual committed the crime in question. First degree home invasion is defined under Michigan law as follows:

> A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is guilty of home invasion in the first degree if at any time while the person is entering, present in, or exiting the dwelling either of the following circumstances exists:
>
> > (a)    The person is armed with a dangerous weapon.
> > (b)    Another person is lawfully present in the dwelling.

Mich. Comp. Laws § 750.110a(2).

First, contrary to Petitioner's argument, it is not necessary that the prosecution prove that Petitioner entered the Garrison's home "with the intent to commit a felony, larceny or assault." Rather, the statute clearly provides that an individual is guilty of First Degree Home Invasion if he

enters a dwelling, in which another person is lawfully present, without permission and at any time while in the dwelling commits an assault. This is the precise theory on which the jury was instructed. (Trial Transcript, August 9, 2010, 81-83). The evidence presented at trial was more than sufficient to sustain Petitioner's conviction on this charge.

### 2.    Aggravated Assault

Under Michigan law, a person is guilty of aggravated assault if the following elements are satisfied: (1) an assault without a weapon; (2) the infliction of serious or aggravated injury; and (3) no intent to commit murder or to inflict great bodily harm. *See People v. Chandler*, 2005 WL 658837 at *2 (Mich. Ct. App., Mar. 22, 2005) (citing Mich. Comp. Laws § 750.81a(1)). Again, interpreted pursuant to the appropriate standard, the evidence was more than sufficient to sustain Petitioner's conviction on this charge.

### 3.    Resisting and Obstructing a Police Officer

Petitioner argues that his conviction for Resisting and Obstructing is unlawful because "there was insufficient evidence to show that [he] intended to resist or obstruct the police." An individual is guilty of resisting and obstructing if the following elements are satisfied: (1) the conduct alleged obstructed, resisted, or opposed; (2) a police officer; (3) in his prescribed duties; and (4) the conduct was done knowingly and willfully. *People v. Lozowsky*, 2004 WL 2347764 at *1 (Mich. Ct. App., Oct. 19, 2004) (citing Mich. Comp. Laws § 750.479(1)). With respect to whether the individual acted knowingly and willfully, the jury may infer such from evidence that the individual physically resisted or opposed the police in the conduct of their official duties. *Lozowsky*,

2004 WL 2347764 at *1.  Interpreted in a light most favorable to the prosecution, the evidence was more than sufficient to sustain Petitioner's resisting and obstructing conviction.

The Michigan Court of Appeals rejected Petitioner's sufficiency of the evidence claims.  In light of the authority and evidence, the Court finds that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, these claims raise no issue upon which habeas relief may be granted.


**III.**         **Evidentiary Claim**  (Habeas Claim V)

Finally, Petitioner argues that he is entitled to relief because his right to a fair trial was violated by the presentation of testimony by prosecution witness William Atchison, Ph.D.  Petitioner asserts that because Atchison was not qualified to testify as an expert in the areas of pharmacology and toxicology his testimony was "wholly unreliable, irrelevant and distracting."

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.  *See Ege v. Yukins*, 485 F.3d 364, 375 (6th Cir. 2007) ([a]ny review of habeas due process claims based on improper admission of evidence must be cognizant of the Supreme Court's mandate that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions'").  This standard is deferential and permits relief "only if an evidentiary ruling is so egregious that it results in a denial of fundamental fairness."  *Id.*  Fundamental fairness does not, however, "require a perfect trial," *Clemmons v. Sowders*, 34 F.3d 352, 358 (6th Cir. 1994), and courts have defined those violations which violate fundamental fairness "very narrowly."  *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir.

2003).  State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.*

The determination by the trial court that Atchison was qualified to offer expert testimony given his educational and professional background is reasonable and consistent with Michigan Rule of Evidence 702.  Petitioner's argument against allowing Atchison to testify concerns the weight he believes Atchison's testimony should have been afforded rather than its admissibility. In this regard, Petitioner was given ample opportunity to cross-examine Atchison so as to demonstrate that his opinions were entitled to little weight.  Moreover, to the extent that Petitioner laments that he was not timely provided Atchison's expert report, the trial court resolved this particular issue by permitting Petitioner to recall his expert witness to testify if he so chose.

The Michigan Court of Appeals rejected this claim stating as follows:

Atchison is employed as a professor of pharmacology and toxicology in the college of veterinary medicine at Michigan State University. He obtained his Ph.D. in pharmacology and toxicology from the University of Wisconsin, Madison in 1980.  Atchison has performed research in neuropharmacology and neurotoxicity.  For over 20 years, he served on various federal advisory boards through the National Institute of Health reviewing research grant proposals from universities requesting federal funding.  Some of the grant requests he has reviewed were regarding the effects of alcohol on the human body.  Atchison spent eight years on a panel that reviewed the toxicity of environmental agents and alcohol, and published over 70 papers in peer review journals on the effects of toxins on the nervous system. Atchison is familiar with trichloroethanol and that it is a metabolite of several drugs and chemicals, including chloral hydrate and trichloroethylene.  Moreover, Haak did not object to Atchison's qualifications at trial.  Accordingly, the trial court did not abuse its discretion in determining that Atchison was qualified as an expert in pharmacology and toxicology.

*Haak*, 2011 WL 6187044 at *4.

In light of the evidence and legal standard, the Court concludes that the denial of this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Likewise, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Thus, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Haak's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  February 10, 2016                    /s/ Ellen S. Carmody_____
                                            ELLEN S. CARMODY
                                            United States Magistrate Judge